UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

|  |  |  |
|---|---|---|
| Michael M., Barbara R., and Lillian M., | ) ) ) | |
| Plaintiffs, | ) ) | Case No.: 3:18-cv-00873 |
| v. | ) ) | **OPINION AND ORDER** |
| Nexsen Pruet Group Medical and Dental Plan, | ) ) ) | |
| Defendant. | ) ) ) | |

This matter is before the Court for review of Defendant Nexsen Pruet Group Medical and Dental Plan's decision to deny a claim for benefits under an employee welfare benefits plan governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 ("ERISA"). Plaintiffs claim that they are entitled to benefits under 29 U.S.C. § 1132(a)(1)(B), and that Defendant's denial of benefits violates the Mental Health Parity and Addiction Equity Act, 29 U.S.C. § 1185a ("MHPAEA"). The parties filed a Joint Stipulation, ECF No. 69, and cross-memoranda in support of judgment. [ECF Nos. 77, 78]. The parties agree that this case may be resolved on the foregoing documents in the record and attachments thereto. [ECF No. 69 p.5].

## FINDINGS OF FACT

Lillian M. ("Lilly") is the daughter of Michael M. ("Mike") and Barbara R. ("Barbara"). Lilly is a beneficiary of Defendant Nexsen Pruet Group Medical and Dental Plan ("the Plan"), an employee welfare benefits plan sponsored by Mike's employer, Nexsen Pruet, LLC ("Nexsen Pruet"). (R. 2826, 2855). Nexsen Pruet is also the Plan's administrator. (R. 2896, 2978). Nexsen Pruet retained Planned Administrators, Inc. ("PAI") and Companion Benefits Alternatives, Inc. ("CBA") to provide third-party Plan-related services. (R. 2828, 2831).

From December 15, 2015 to October 14, 2016, Lilly received treatment at Uinta Academy ("Uinta") for mental health issues including anxiety, depression, ADHD, relational issues, and an eating disorder. (R. 1-11, 801, 801). Mike and Barbara submitted claims to the Plan in order to cover the cost of Lilly's treatment at Uinta. The Plan's denial of benefits gave rise to this action.

## I.     Uinta Academy

Lilly first began receiving treatment for an eating disorder at The Hearth, Center for Eating Disorders, in Columbia, South Carolina. (R. 15, 789). The treatment was categorized as intensive outpatient ("IOP") and was covered by the Plan. (R. 2649). After The Hearth unexpectedly closed, Mike and Barbara engaged an educational consultant, The Price Group, to determine a course of action. (R. 1455, 2821).

In accordance with the plan developed by The Price Group, Lilly was admitted to Pacific Quest, an intensive wilderness therapy program with 24-hour supervision to "jump start" her treatment. *Id.* She subsequently enrolled at Uinta Academy in Wellsville, Utah. Uinta was licensed in the state of Utah to provide mental health and residential treatment for females aged 12 to 17. (R. 1472).[1]

In support of Plaintiffs' claim for benefits, Uinta authored a letter dated January 4, 2016, which stated "[Lilly] has previously participated in IOP, [*i.e.*, The Hearth] but quickly relapses in negative behaviors due to the inability to maintain changes. [Lilly] requires a high level of therapeutic intervention and needs residential care (RTC) to further treat her to help improve her functionality and prepare her for life as a young adult." The letter concluded that "if [Lilly] does not receive this level of care, she will progress to a state of chronic, persistent mentally ill which will require more resources and cost the state even more financially from a long term perspective."

---

[1] The parties disagree about whether Uinta was licensed to provide care to adults. The Court declines to make that finding as it would not affect the outcome.

Uinta provided 24-hour supervision and worked with Lilly and her parents to achieve treatment goals via therapeutic milieu; equine therapy; as well as individual, family, and group therapy.

## II.    Terms of the Plan

The Plan only provides benefits for treatment that is "medically necessary." That term is defined as follows:

> **Medically Necessary/Medical Necessity**: heath care services that a Physician, exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, disease or its symptoms, and that are:
>
> 1.  in accordance with generally accepted standards of medical practice;
>
> 2.  clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's illness, injury or disease; and
>
> 3.  not primarily for the convenience of the patient, Physician, or other health care provider, and not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of the patient's illness, injury or disease.
>
>    For the purposes of this definition "generally accepted standards of medical practice" means standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community, Physician Specialty Society recommendations and the views of Physicians practicing in relevant clinical areas and any other relevant factors.

[ECF No. 69 p.2-3].

The Plan further contains specific exclusions. No benefits are available for "[a]ny medical social services, recreational or Milieu Therapy, education testing or training, except as part of a Pre-Authorized Home Health Care or Hospice Care program," as well as "[a]dmissions or portions thereof for custodial care or long term care including . . . . Psychiatric or Substance Abuse residential treatment when provided at therapeutic schools; wilderness/boot camps; therapeutic boarding homes; half-way houses, and therapeutic group homes." (R. 2860-62, 2942-44).

In evaluating the MHPAEA claim, the parties agree that the Court must compare the benefits available under the Plan with respect to skilled nursing facilities with the benefits available under the Plan with respect to residential treatment facilities.  The parties have stipulated, ECF No. 69 p.3-4, that the Court should consider the following Plan provisions related to residential treatment facilities and skilled nursing facilities:

> **Residential Treatment Center:** a licensed institution, other than a Hospital, which meets all six of these requirements:
>
> 1. Maintains permanent and full-time Facilities for bed care of resident patients, and
> 2. Has the services of a Psychiatrist (Addictionologist, when applicable) or Physician extender available at all times and is responsible for the diagnostic evaluation, provides face-to-face evaluation services with documentation a minimum of once/week and PRN as indicated; and
> 3. Has a Physician or registered nurse (RN) present onsite who is in charge of patient care along with one or more registered nurses (RNs) or licensed practical nurses (LPNs) onsite at all times (24/7); and
> 4. Keeps a daily medical record for each patient; and
> 5. Is primarily providing a continuous structured therapeutic program specifically designed to treat behavioral health disorders and is not a group or boarding home, boarding or therapeutic school, half-way house, sober living residence, wilderness camp or any other facility that provides Custodial Care; and
> 6. Is operating lawfully as a residential treatment center in the area where it is located.
>
> (R. 2899, 2981).
>
> **Skilled Nursing Facility** is defined to mean: "an institution other than a Hospital that is certified and licensed by the appropriate state regulatory agency as a skilled nursing facility."
>
> (R. 2899, 2981).

The Plan provided for Covered Expenses in a Skilled Nursing Facility under specified circumstances:

> 31. Covered Expenses incurred for Admission in a **physical rehabilitation facility** or **Skilled Nursing Facility** for participation in a multidisciplinary team-structured rehabilitation program following severe neurologic or physical impairment. The Participant must be under the continuous care of a Physician and the attending Physician must certify that the individual requires nursing care 24 hours a day. Nursing care must be rendered by a registered nurse or a licensed vocational or

practical nurse. The confinement cannot be primarily for domiciliary, custodial, personal type care, care due to senility, alcoholism, drug abuse, blindness, deafness, mental deficiency, tuberculosis or Mental Disorders.

(R. 2853, 2933, 2935).

It also specifically provided benefits for:

37. Covered Expenses at a Residential Treatment Center.

(R. 2853, 2933, 2935).

## III.    Claims and Appeals

After Lilly's admission to Uinta, her parents submitted a claim to have the treatment covered.

(R. 1432).  On December 29, 2015, CBA denied the claim because:

Services must be authorized in advance.  No authorization was obtained for this request.  Your health plan document requires services to be medically necessary for benefit coverage.  Medically necessary services are health care services that a physician, hospital or other covered professional of facility provides for the purpose of preventing, evaluating, diagnosing or treating an illness, disease or its symptoms.

(R. 1432).

Uinta had not provided CBA with any requested clinical information by the time of the denial.  (R. 1136, 1138-39).  By letter dated February 11, 2016, Barbara appealed the decision and requested a re-review of medical necessity.  (R. 77, 1188).  On March 17, 2016, CBA determined that Lilly's treatment at Uinta was not medically necessary, as determined by CBA's utilization management criteria, and again denied benefits.  (R. 1188).  CBA found that "the information provided by [Uinta] did not meet CBA's utilization management criteria for the requested service."  *Id.* Specifically, CBA found that "[t]he clinical information submitted did not document body weight, lab, or vital sign abnormalities that required continuous supervision and monitoring, risk of harm to self or others, nor acute unstable mental health symptoms that could not be managed outside of a 24-hour structured setting."  *Id.*  With respect to 2015 claims, the Plan rendered its final decision

on May 25, 2016, finding that benefits were properly precluded under the terms of the Plan.  (R. 2553).  The May 25, 2016 denial letter concluded that Lilly's care at Uinta was not medically necessary within the meaning of the Plan and that the specific exclusions for recreational therapy, milieu therapy, and long-term or custodial care at a therapeutic school applied to Lilly's claim.  *Id.* Defendant further stated that the claim had not been preauthorized and that Uinta did not satisfy the definition of a "Residential Treatment Center."  *Id.*

With respect to the 2016 claims,[2] Plaintiffs sought an external review by Medical Review Institute of America ("MRI").  (R. 2396, 2543-45).  Had MRI indicated the services were Medically Necessary, the Plan would have been obligated to accept the decision as binding on the Plan and pay for the benefits in accordance with Plan provisions.  45 C.F.R. § 147.136(d)(2)(iii)(B)(7)(v).  Instead, MRI upheld the denial of benefits via letter dated October 11, 2016 applying CBA's utilization management criteria.  (R. 2542-43).  MRI's medical necessity analysis differed from CBA's in that MRI applied eating disorder criteria, whereas CBA applied mental health treatment criteria.  (R. 2543).  MRI found that Lilly's eating disorder was not so severe that 24-hour supervision was required and that her other psychiatric conditions (*i.e.*, depression, anxiety, ADHD, and familial relationship issues) were not serious enough to warrant the use of 24-hour residential treatment.  (R. 2545-46).  The MRI letter states that "[t]here was no evidence of imminent risk of deterioration if [Lilly] had been treated at a less intensive level of care" and that Lilly "could have been safely and effectively treated through the use of intensive outpatient program (IOP) level of care."  *Id.*  On October 26, 2016, Mike requested that the Plan make an exception to its policy or find that the MRI decision was wrong.  (R. 2539).  The Plan

---

[2] After the March 17, 2016 denial by CBA, Plaintiffs' claims for 2016 services progressed through an appeal to an Independent Review Organization ("IRO") in accordance with a change in applicable law not germane to this litigation.  *See* 45 C.F.R. § 147.136.  The May 25, 2016 letter was the final determination with respect to 2015 claims.

responded that no exception could be made and that the claims decision was consistent with the terms of the Plan. *Id.* The parties stipulate that the Plan's administrative remedies have been fully exhausted. [ECF No. 69 p.1]. Plaintiffs subsequently filed suit on November 29, 2017, seeking benefits for Lilly's treatment at Uinta. [ECF No. 1].

## CONCLUSIONS OF LAW

### I. THE ERISA CLAIM

#### A. The Applicable Standard of Review is Abuse of Discretion

The parties dispute what standard the Court should apply in reviewing the Plan's decision to deny benefits. [ECF No. 69]. Defendant argues that its decision should be reviewed for abuse of discretion and cites the terms of the Plan as reserving final authority to interpret terms and make a final coverage determination. [ECF No. 77 p.14]. Plaintiffs assert that, because the rationale for denying the claim shifted during different levels of review, they were denied a "full and fair review" as required under ERISA. [ECF No. 78 p.12-13]. It follows, Plaintiffs argue, that the claim is "deemed denied," and reviewed *de novo* under 29 C.F.R. § 2590.715-2719(b)(2)(ii)(F)(1). *Id.*

When a plaintiff challenges the denial of benefits under a plan governed by ERISA, the reviewing court must apply a *de novo* standard in reviewing the administrator's determination "unless the plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

The Plan at issue in this case provides as follows:

The Plan Administrator has full discretionary authority to interpret and apply all Plan of Benefits provisions, including, but not limited to, all issues concerning eligibility and determination of Benefits. The Plan Administrator may contract with an independent administrative firm to process claims, maintain Group Health

> Plan data, and perform other Group Health Plan connected services; however, final authority to construe and apply the provisions of the Plan of Benefits rests exclusively with the Plan Administrator. Decisions of the Plan Administrator, made in good faith, shall be final and binding.

(R. 2887, 2969).

The Court finds the foregoing language sufficient to reserve final authority to Defendant on coverage determination matters: including interpretation, construction, and application of the Plan's terms. Plaintiffs do not dispute that this conclusion is warranted under *Firestone*, but instead urge a heightened standard of review because they were denied a "full and fair review" of their claim during the prelitigation process. [ECF No. p.12-13]. Because the claims were denied on differing grounds at each level of appeal, Plaintiffs argue, the claims should be deemed denied "without the exercise of discretion by an appropriate fiduciary." 29 C.F.R. § 2590.715-2719(b)(2)(ii)(F)(1). A claim for benefits is deemed denied when a plan fails to strictly adhere to procedural requirements during the internal claims and appeals process. *Id.* These requirements include a "full and fair review" of the claim, and, before the plan can issue a final adverse determination "based on new or additional rationale," the claimant must be provided with the rationale sufficiently in advance of the notice of a final adverse benefit determination. *Id.* 2590.715-2719(b)(2)(ii)(C)(2). This requirement is intended "to give the claimant a reasonable opportunity to respond" prior to a final determination. *Id.* While the regulations require "strict compliance," a claim will not be deemed denied without the exercise of discretion based on:

> de minimis violations that do not cause, and are not likely to cause, prejudice or harm to the claimant so long as the plan or issuer demonstrates that the violation was for good cause or due to matters beyond the control of the plan or issuer and that the violation occurred in the context of an ongoing, good faith exchange of information between the plan and the claimant.

*Id.*; § 2590.715-2719(b)(2)(ii)(F)(2). While Plaintiffs assert that the Plan denied the claim based on differing rationale such that they could not adequately respond on appeal, the record

demonstrates that Plaintiffs were advised that Lilly's treatment was not medically necessary at each determination.[3]  In addition, the use of mental health versus eating disorder criteria during the CBA appeal and MRI appeal, respectively, are not material in the context of 2590.715-2719(b)(2)(ii)(C)(2).  The rule only requires notice of new or additional rational sufficiently in advance of a "final" adverse benefit determination.  Plaintiffs do not claim that they lacked notice of the grounds on which the final determination was based, and the Joint Stipulation does not otherwise indicate that Plaintiffs were denied a full and fair review of their claim during the prelitigation process.  The Court therefore reviews the decision to deny benefits under an abuse of discretion standard.

Under the abuse of discretion standard, "courts do not review the merits of the administrator's decision, but rather decide only the contractual questions of whether the administrator exceeded its power or abused its discretion because only those inquiries are relevant to whether the administrator's decision breached the contractual provision."  *Haley v. Paul Revere Life Ins. Co.*, 77 F.3d 84, 88 (4th Cir. 1996).

### B.    Burden of Proof

Plaintiffs initially bore the burden to prove that Lilly was entitled to coverage for the treatment she received at Uinta.  *Harrison v. Wells Fargo Bank, N.A.*, 773 F.3d 15, 24 (4th Cir. 2014) (citing *Berry v. Ciba-Geigy Corp.*, 761 F.2d 1003, 1008 (4th Cir. 1985)).  Additionally, under the abuse of discretion standard, Plaintiffs must now show the Plan, through its agents, acted unreasonably in exercising its discretion to deny benefits.  *Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 342-343 (4th Cir. 2000).

---

[3] CBA's first denial on December 29, 2019, enumerates only lack of preauthorization; however, CBA advised that claims for medically unnecessary treatment would not be paid.  No criteria-based analysis could be completed because Uinta had not provided any clinical information at this stage, and the Court finds no prejudice or bad faith in connection with the initial denial.

### C.     The Plan did not Abuse its Discretion

The abuse of discretion standard requires a reviewing court to show enough deference to a primary decision-maker's judgment that the court does not reverse merely because it would have come to a different result in the first instance. *Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315 321 (4th Cir. 2008). The Court will not disturb the Plan's decision if it is reasonable. *See Booth*, 201 F.3d at 342. In *Booth*, the Fourth Circuit held that courts are to determine the reasonableness of a fiduciary's discretionary decision by considering the following non-exhaustive list of factors:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Booth*, 201 F.3d at 342–43.

The Court will address each factor in turn.

### 1.     The Language of the Plan Supports Nexsen Pruet's Decisions

#### a.     The Pre-Authorization Language in the Plan does not Support the Initial Rejection Decision

The language of the Plan contemplates pre-authorization. (R. 2910, 2831, 2473). It states "[a]ll Admissions and some Benefits (as indicated herein or on the Schedule of Benefits) require Pre-Authorization to determine the Medical Necessity of such Admission or Benefit. (R. 2831, 2910). The Schedule of Benefits explains that all Admissions require Pre-Authorization. (R. 2839, 2919). Failure to obtain pre-authorization for **Admissions** could result in denial. *Id.* The Plan defines Admission as: "the period of time between a Participant's entry as a registered bed-patient

into a Hospital or Skilled Nursing Facility and the time the Participant leaves or is discharged."
(R. 2888, 2970). The parties agree that, if Uinta qualifies as anything, it qualifies as a Residential
Treatment Facility rather than a Hospital or Skilled Nursing Facility. [ECF Nos. 78 p.4, 76 p.33].
Accordingly, Lilly's treatment at Uinta was not an Admission under the Plan. Therefore, the
language in the Plan stating that it would deny benefits due to failure to obtain pre-authorization
is not applicable.

Instead, Lilly's treatment falls under "some Benefits" that require pre-authorization under the
Plan. (R. 2831, 2910). The Schedule of Benefits provides: "**[t]he following services require Pre-
Authorization.** If Pre-Authorization is not obtained for a Non-Participating Provider, there will
be a $200 penalty for which the Participant is responsible." (R. 2839, 2919). One of the services
listed is "Inpatient and Outpatient Mental Health." *Id.* The language of the Plan does not
contemplate denying coverage for failure to obtain pre-authorization for these services. Instead,
it imposes a $200 fine. CBA's December 29, 2015 denial of coverage based on failure to obtain
pre-authorization was not consistent with the language of the Plan.

> **b.     The Medically Necessary Language in the Plan Supports Nexsen
> Pruet's Final Decisions**

Each denial following the initial December 29, 2015 letter cited Medical Necessity as a reason
for denying coverage.[4]  CBA's March 17, 2016 denial of Barbara's appeal states that a registered
nurse and a board-certified psychiatrist determined the service was not medically necessary. (R.
768-69). Nexsen Pruet's May 25, 2016 letter upholding CBA's denial states: "PAI[5] determined
that the care did not satisfy the Medically Necessary standard for coverage under the Plan." (R.

---

[4] The December 29, 2015 letter mentions medical necessity but did not make its determination on that
basis. *See* (R. 1432).
[5] As it had the discretion to do under the Plan, Nexsen Pruet retained PAI to assist the Plan Sponsor in
making the determination on appeal. (R. 2915, 2836).

2566).  MRI's external, third-party review of the 2016 claims found that "[t]he eating disorder treatment at the residential treatment center level of care for dates of services 12/15/15 – forward is not medically necessary for this patient . . ."  (R. 2543).  Nexsen Pruet adopted this MRI finding as its final decision.  (R. 2539).  Every denial of coverage after the first explicitly based its finding, at least in part, on a lack of medical necessity.

The language of the Plan discusses Medical Necessity:

> **Medically Necessary/Medical Necessity**: health care services that a Physician, exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, disease or its symptoms, and that are:
>
> 1. in accordance with generally accepted standards of medical practice;
>
> 2. clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's illness, injury or disease; and
>
> 3. not primarily for the convenience of the patient, Physician, or other health care provider, and not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of the patient's illness, injury or disease.
>
> For the purposes of this definition "generally accepted standards of medical practice" means standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community, Physician Specialty Society recommendations and the views of Physicians practicing in relevant clinical areas and any other relevant factors.

[ECF No. 69 p.2-3].

Nexsen Pruet's decisions based on Medical Necessity are reasonable based on this language in the Plan.  Each denial that considered Medical Necessity evaluated clinical data from the provider against CBA's utilization management criteria.  (R. 766).  That criteria is developed, reviewed, and approved by a panel of behavioral health professionals.  *Id.*  It cites over 70 reputable sources in the field in its reference section.  (R. 2381-86).  During CBA's consideration of the appeal, a registered nurse and a board-certified psychiatrist determined the service was not medically

necessary under the criteria. (R. 768-69). During MRI's consideration of the appeal a physician reviewer board certified by the American Board of Psychiatry and Neurology in General Psychiatry and Child and Adolescent Psychiatry came to the same conclusion. (R. 2543).

Well-qualified reviewers made decisions based on well-supported criteria. This process showed an evaluation of Medical Necessity based on "generally accepted standards of medical practice." [ECF No. 69 p.2-3]. This process also showed that decisionmakers understood generally accepted standards of medical practice as "standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community, Physician Specialty Society recommendations, and the views of Physicians practicing in relevant clinical areas and any other relevant factors." *Id.* The decisions based on medical necessity were reasonable based on the language of the Plan.

Although the first denial based on failure to obtain pre-authorization was inconsistent with the language of the Plan, the rest of the denials based on medical necessity were supported by the language of the Plan. Because medical necessity was the continuing and final basis for denial throughout the appeal process, the language in the Plan related to medical necessity is the most pertinent. The fact that the medical necessity language was ultimately relied upon cures the defect of inconsistently applying the pre-authorization language in the initial denial. *See Champion v. Black & Decker (U.S.) Inc.,* 550 F.3d 353, 362 (4th Cir. 2008) (finding no abuse of discretion where the Plan cured any initial procedural irregularities). Accordingly, the Court finds that the first *Booth* factor weighs in favor of the Defendant.

### 2.    Nexsen Pruet's Decisions Align with the Purposes and Goals of the Plan

The purpose of the Plan is to reimburse participants and beneficiaries for medically necessary treatments. While a comprehensive Group Health Plan must fulfil its obligations under the Plan,

it is not required to pay for every medical treatment a participant or beneficiary might receive. One basic goal of the Plan is to be financially viable and sustainable. The financial sustainability of the Plan necessarily requires limiting reimbursements to treatments that are medically necessary.

The Plan determined that the treatment was not medically necessary. Once that determination was made, the decision to deny benefits followed from the purposes and goals of the Plan. The Court finds that the second *Booth* factor weighs in favor of the Defendant.

### 3. The Materials Considered to Make the Decision were Adequate and Support the Decisions

The parties agree that the medical records considered in this matter were adequate. According to Plaintiffs, there were over 680 pages of medical records considered in this matter. [ECF No. 78 p.22]. Defendant contends that the materials support the decisions, while Plaintiffs contend that they do not. [ECF Nos. 78 p.22, 77 p.19]. Both Nexsen Pruet (through PAI) and MRI reviewed all the materials supplied by the professionals who treated Lilly. (R. 2544, 2566). This comprehensive review of medical records indicates substantial evidence supporting the decisions. The Court finds that the third *Booth* factor weighs in favor of the Defendant.

### 4. There is no Evidence that the Fiduciary's Interpretation was Inconsistent with other Provisions in the Plan or with Earlier Interpretations of the Plan

Plaintiffs have not pointed to, and the record does not reveal, any evidence that Nexsen Pruet's interpretation of the Plan was inconsistent with other provisions in the Plan or with earlier interpretations of the Plan. However, Defendant does not put forward affirmative evidence of consistency. [*See* ECF No. 77 p.20]. Accordingly, the fourth *Booth* factor is given no weight.

### 5.    The Decision-Making Process was Reasoned and Principled

Four medical necessity reviews were conducted.  In the first, CBA reviewed a letter from Uinta signed by a therapist and psychiatrists, applicant information, an initial treatment plan, and the master treatment plan.  (R. 2190-2215).  A registered nurse and a board-certified psychiatrist concluded that the treatment was not medically necessary.  (R. 768-69).  Specifically, CBA reviewed the submissions and took issue with the fact that the "information submitted did not document body weight, lab or vital sign abnormalities that required continuous supervision and monitoring, risk of harm to self or others, nor acute unstable mental health symptoms that could not be managed outside of a 24 hour structured setting." (R. 765-67).  Second, Nexsen Pruet had PAI, a third-party administrator, review the materials and make a determination.  (R. 2562-66).  PAI determined, and Nexsen Pruet agreed, that the charges related to Lilly's stays at Uinta should be denied under the terms of the Plan.  (R. 2566).  This denial included an encouragement to appeal to an independent review organization for the 2016 claims.  *Id.*  Third, Plaintiffs appealed to MRI for external review.  MRI had a physician certified by the American Board of Psychiatry and Neurology in General Psychiatry and Child and Adolescent Psychiatry review over 680 pages of documents.  (R. 2543).  He came to the same conclusion.  *Id.*  Fourth and finally, Michael asked the Plan to reject MRI's conclusion and provide coverage.  (R. 2539).  Nexsen Pruet declined to do so.  *Id.*

Based on the procedural integrity of this review process, the qualifications of various reviewers, and the Plan's deference to third parties, the Court finds that the decision-making process was reasonable and principled.  The reviews were not arbitrary.  Instead, the Plan relied on persons with expertise in this area in making its decision.  These persons considered adequate evidence and arrived at the same conclusion.  Plaintiffs point out that each review did not arrive at

the same conclusion via identical reasoning.  However, that indicates a lack of collusion and true

independent review: characteristics of a reasoned and principled process.  The fifth *Booth* factor

weighs in favor of the Defendant.

### 6.    The Decision was Consistent with the Procedural and Substantive Requirements of ERISA

Plaintiffs point to an alleged procedural irregularity to show an abuse of discretion.  Plaintiffs

contend that the bases for denial were constantly shifting.  [ECF No. 78 p.14].  As discussed *supra*,

the Plan likely erred in initially denying coverage based on failure to obtain pre-authorization.

However, that initial denial also mentioned medical necessity.  (R. 1432).  More importantly, while

each of the later denials contained some differences, they all had one thing in common: they denied

coverage because the treatment was not medically necessary.  The bases for denial were not

constantly shifting.  Every step of the way, the Plan denied coverage based on medical necessity.

Admittedly, the justification for that decision was based on "mental health residential treatment"

criteria at one point and "eating disorder residential treatment" criteria at another.  Again, however,

the Plaintiffs were tasked with showing medical necessity at every step.  Any variation present in

the denials did not deprive Plaintiffs of the procedural and substantive requirements of ERISA.

### 7.    The Relevant External Standards Support Nexsen Pruet's Decisions

Both CBA and MRI applied CBA's Utilization Management Criteria to determine Medical

Necessity.  (R. 766, 2543).  CBA's Utilization Management Criteria is developed, reviewed, and

approved by a panel of behavioral health professionals.  (R. 766).  The criteria were developed

citing more than 70 published sources.  (R. 2381).  CBA and MRI independently reviewed

adequate information, applied the criteria, and came to the same conclusion.  (R. 765, 2543).

Plaintiffs argue that MRI improperly focused on Lilly's eating disorder when applying the criteria.

[ECF No. 78 p.21].  However, given that the MRI reviewer had more than 680 pages of treatment

records, and Lilly's initial treatment at the Hearth arose from her eating disorder, the Court cannot find that the application of this criteria constitutes an abuse of discretion. The sixth *Booth* factor weighs in favor of the Defendant.

8. **A Structural Conflict of Interest Existed but did not Impact the Decisions at Issue**

An administrator suffers from a conflict of interest when it plays a dual role of determining whether an employee is eligible for benefits and paying those benefits out of its own pocket. *Shepherd v. Cmty. First Bank*, No. 8:15-CV-04337-DCC, 2019 WL 1405849, at \*14 (D.S.C. Mar. 28, 2019) (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008)). Here, the Plan is self-funded, so the administrator suffers from a structural conflict of interest. Having found a conflict of interest is present, the eighth *Booth* factor weighs in favor of the Plaintiffs.

The remaining question is how heavily the Court should weigh the conflict of interest factor. The conflict of interest factor should prove more important where circumstances suggest a higher likelihood that it affected the benefits decision and prove less important where the administrator has taken active steps to reduce potential bias and promote accuracy. *Id.* Here, the Court finds that this factor is less important. There is no evidence of bad faith: the Plan provided and encouraged third-party review. The eighth *Booth* factor weighs in favor of Plaintiffs but is not afforded great importance based on the facts of this case.

9. **The *Booth* Factors do not Support a Finding that the Plan Abused its Discretion**

Considering the *Booth* factors, the Court finds that factors one, two, three, five, six, and seven all favor the Defendant. Factor four is neutral, and factor eight slightly favors the Plaintiffs. This evaluation of the *Booth* factors requires the conclusion that the Plan's decision was reasonable. The Court cannot reverse merely because it would have come to a different result in the first

instance, *Evans*, 514 F.3d at 321, and the Court will not disturb the Plan's decision if it is reasonable. *See Booth*, 201 F.3d at 342. The Plan did not abuse its discretion and is, therefore, entitled to judgment in its favor on Plaintiffs' ERISA claim.

## II.     THE MHPAEA CLAIM

### A.     The Applicable Standard of Review is *de novo*.

The parties agree that the Court's review of whether the Plan violates the MHPAEA is *de novo*. [ECF No. 69 p.1-2].

### B.     The Plan does not Violate the MHPAEA on its Face or as Applied.

Plaintiffs argue that the Plan violates the MHPAEA on its face and as applied in denying Lilly's treatment. Congress enacted MHPAEA "to end discrimination in the provision of insurance coverage for mental health and substance use disorders as compared to coverage for medical and surgical conditions in employer-sponsored group health plans." *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 356 (2d Cir. 2016). Where a group health plan provides both medical/surgical benefits and mental health/substance use disorder benefits, the law requires that "the treatment limitations applicable to such mental health or substance use disorder benefits are no more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits . . . ." 29 U.S.C. § 1185a(a)(3)(A)(ii). Treatment limitations under the MHPAEA can be quantitative or nonquantitative. 29 C.F.R. § 2590.712(a). Quantitative treatment limitations are expressed numerically (such as fifty outpatient visits per year), while nonquantitative treatment limitations otherwise limit the scope or duration of benefits for treatment under a plan or coverage. *Christine S. v. Blue Cross Blue Shield of New Mexico*, 428 F. Supp. 3d 1209, 1219 (D. Utah 2019) (citing 29 C.F.R. § 2590.712(a)).

Here, Plaintiffs allege the improper imposition of a nonquantitative limitation.  [ECF No. 78 p.24].   Nonquantitative limitations include, for example, "[m]edical management standards limiting or excluding benefits based on medical necessity or medical appropriateness or based on whether the treatment is experimental or investigative."  29 C.F.R. § 2590.712(c)(4)(ii)(A).  "A group health plan . . . may not impose a nonquantitative treatment limitation with respect to mental health or substance use disorder benefits in any classification unless, under the terms of the plan . . . as written and in operation, any processes, strategies, evidentiary standards, or other factors used in applying the nonquantitative treatment limitation to mental health or substance use disorder benefits in the classification are comparable to, and are applied no more stringently than, the processes, strategies, evidentiary standards, or other factors used in applying the limitation with respect to medical/surgical benefits in the classification."  29 C.F.R. § 2590.712.  In short, a plan may not impose a nonquantitative limitation for mental health or substance use disorder benefits that is more restrictive than the limitations on comparable medical/surgical benefits.  *A.H. by & through G.H. v. Microsoft Corp. Welfare Plan*, No. C17-1889-JCC, 2018 WL 2684387, at \*6 (W.D. Wash. June 5, 2018).

There are two ways a plaintiff can allege a violation of the MHPAEA: (1) she can make a facial challenge by alleging that the terms of the Plan discriminate against mental health and substance abuse treatments in comparison to medical or surgical treatment; and (2) she can make an as-applied challenge by alleging that, although the same nonquantitative treatment limitation is applied to both mental health/substance use disorder benefits and to medical/surgical benefits, it is not applied in a comparable way.  *Welp v. Cigna Health & Life Ins. Co.*, No. 17-80237-CIV, 2017 WL 3263138, at \*6 (S.D. Fla. July 20, 2017); 29 C.F.R. § 2590.712(c)(4)(ii)(A).  Here, the Plaintiffs allege both a facial and as-applied violation.  [ECF No. 78 pp.26-27].

1.    **Treatment at a Skilled Nursing Facility is the Proper Comparator for Treatment at a Residential Treatment Center**

To determine whether the Plan has imposed a more restrictive limitation on mental health/substance use disorder benefits than comparable medical/surgical benefits, the Court must identify what specific benefits it is comparing.  *See A.H.* 2018 WL 2684387, at *6 ("a plaintiff must show that . . . the mental health or substance use disorder benefit being limited is in the same classification as the medical surgical benefit to which it is being compared.").  Here, the parties agree that the Court should compare mental health/substance use disorder treatment at residential treatment centers with medical/surgical treatment at skilled nursing facilities.[6] [ECF Nos. 77 p.26, 78 p.26].  Therefore, the question before the Court is whether Plaintiffs showed a nonquantitative limitation on mental health benefits at a residential treatment center that is more restrictive than medical/surgical benefits at a skilled nursing facility.

2.    **The Plan's Definitions of Residential Treatment Center and Skilled Nursing Facility Do Not Constitute a Facial Violation of the MHPAEA**

Plaintiffs claim that the Plan violates the MHPAEA on its face because it contains a disparity between the definitions of a skilled nursing facility and a residential treatment center.  [ECF No. 78 p.30].  According to Plaintiffs, this disparity violates the MHPAEA because it imposes more restrictive "processes, strategies, evidentiary standards, or other factors" on mental health/substance use disorder benefits than medical/surgical benefits.  29 C.F.R. § 2590.712.  If

---

[6] Plaintiffs also mention medical/surgical benefits provided in hospice and inpatient rehabilitation settings. [ECF No. 28].  However, Plaintiffs did not argue that hospice or inpatient rehabilitation were proper comparators for residential treatment centers.  They merely sought to point out other parts of the Plan that provide for subacute care in intermediate settings for medical/surgical treatment.  *Id.*

the Plan's respective definitions of "Residential Treatment Center" and "Skilled Nursing Facility"

establish a nonquantitative treatment limitation, the Plan facially violates the MHPAEA.

The Plan, as it existed in 2015 and 2016 defines "Skilled Nursing Facility" as "an institution

other than a hospital that is certified and licensed by the appropriate state regulatory agency as a

skilled nursing facility." (R. 2899, 2981). Both versions of the Plan define "Residential Treatment

Center" as follows:

> **Residential Treatment Center:** a licensed institution, other than a Hospital, which
> meets all six of these requirements:
>
> 1. Maintains permanent and full-time Facilities for bed care of resident patients, and
> 2. Has the services of a Psychiatrist (Addictionologist, when applicable) or Physician
>    extender available at all times and is responsible for the diagnostic evaluation,
>    provides face-to-face evaluation services with documentation a minimum of
>    once/week and PRN as indicated; and
> 3. Has a Physician or registered nurse (RN) present onsite who is in charge of patient
>    care along with one or more registered nurses (RNs) or licensed practical nurses
>    (LPNs) onsite at all times (24/7); and
> 4. Keeps a daily medical record for each patient; and
> 5. Is primarily providing a continuous structured therapeutic program specifically
>    designed to treat behavioral health disorders and is not a group or boarding home,
>    boarding or therapeutic school, half-way house, sober living residence, wilderness
>    camp or any other facility that provides Custodial Care; and
> 6. Is operating lawfully as a residential treatment center in the area where it is located.
>
> *Id.*

Plaintiffs point out that the definition of "Skilled Nursing Facility" is relatively simple and

straightforward, while the definition of "Residential Treatment Center" has six components. [ECF

No. 78 p.30]. To qualify as a "Skilled Nursing Facility," an institution only needs to be certified

and licensed by the appropriate state regulatory agency. (R. 2899, 2981). That requirement is

analogous to component six of the "Residential Treatment Center" definition: "operating lawfully

as a residential treatment center in the area where it is located." *Id*. However, in addition to this

analogous requirement, an institution must also satisfy components one through five to qualify as

a "Residential Treatment Center." *Id.* Undeniably, the definition of "Residential Treatment Center" in the Plan is more restrictive than the definition of "Skilled Nursing Facility."

However, the Court must also look beyond the definitions to determine whether the Plan imposes more a restrictive nonquantitative limitation on treatment in a residential treatment center than treatment in a skilled nursing facility. As Defendants point out, the section of the Plan on "Specific Covered Benefits" governs covered benefits in addition to the definitions. (R. 2853, 2953). This section does not add any limitations to treatment in a Residential Treatment Center. It simply states that it will provide benefits for "Covered Expenses at a Residential Treatment Center." *Id.* On the other hand, this section does impose additional limitations on coverage incurred for admission in a skilled nursing facility:

> 31. Covered Expenses incurred for Admission in a physical rehabilitation facility or **Skilled Nursing Facility** for participation in a multidisciplinary team-structured rehabilitation program following severe neurologic or physical impairment. The Participant must be under the continuous care of a Physician and the attending Physician must certify that the individual requires nursing care 24 hours a day. Nursing care must be rendered by a registered nurse or a licensed vocational or practical nurse. The confinement cannot be primarily for domiciliary, custodial, personal type care, care due to senility, alcoholism, drug abuse, blindness, deafness, mental deficiency, tuberculosis or Mental Disorders.

(R. 2853, 2935).

Reading the Plan as a whole, the treatment covered at a residential treatment center and a skilled nursing facility cannot be meaningfully distinguished. The additional limitations on "Skilled Nursing Facility" benefits in the section describing covered benefits mirror the additional limitations imposed by the more restrictive definition of "Residential Treatment Center." To be covered, treatment at either type of facility requires continuous care of a physician (or psychiatrist or addictionologist); that a nurse is available 24/7; and that the treatment is not custodial in nature.

Any other differences in the limitations are semantic or *de minimis* and are attributable to the differences in the treatment being described.

To further support its argument that the Plan's terms impose the same limitations on treatment in residential treatment centers and skilled nursing facilities, Defendant cites The Blue Cross Blue Shield of South Carolina's Medical Management Policy/Procedure Manual ("the BCBS Manual"). [ECF No. 77 p.28].  Defendant states that this document is "used to evaluate medical necessity." *Id.*  The BCBS Manual states that a Skilled Nursing Facility must meet all of the following requirements:

> (a) maintain permanent and full-time facilities for bed care of resident patients; (b) have available at all times the services of a physician; (c) have a registered nurse (RN) or physician on full-time duty in charge of patient care, and one or more registered nurses or licensed practical nurse (LPN) on duty at all times; (d) maintain a daily medical record for each patient, (e) primarily be engaged in providing continuous skilled nursing care for sick or injured persons during the convalescent stage of illness or injuries and is not, other  than  incidentally, a rest home or a home for Custodial Care for the aged; and (f) operates lawfully as a nursing home in the jurisdiction where it is located. However, the institution cannot be primarily engaged in the care and treatment of drug addiction or alcoholism.

(R. 2812-13).

This criterion mirrors the components of "Residential Treatment Center" definition.  The BCBS Manual shows that the requirements for a Skilled Nursing Facility cannot be meaningfully distinguished from the requirements for a Residential Treatment Center under the Plan.  The terms of the Plan do not contain a facial disparity that limits coverage for mental health care in a way that is more restrictive than medical/surgical care.

### 3.    The Plan's Application of the Utilization Management Criteria Does Not Constitute an As-Applied Violation of the MHPAEA

In their ERISA claim and their "as-applied" MHPAEA claim, Plaintiffs argue that the utilization management criteria the Plan used to deny coverage for Lilly's mental health claims

were overly strict.  *See* [ECF No. 78].  Plaintiffs put forward two related arguments in support of the "as-applied" claim: (1) CBA applied criteria that did not adhere to generally accepted standards of care; and (2) the Defendant denied coverage based on lack of acute symptoms when coverage for sub-acute treatment was available for medical/surgical benefits.  [ECF No. 78 pp. 24, 26].

With respect to Plaintiffs' first argument, the Court has already determined that CBA's application of its utilization management criteria adhered to the generally accepted standards of care.  A deviation from these standards would have constituted an abuse of the Plan's discretion. For the reasons set forth in section I, *supra*, CBA's application of its utilization management criteria adhered to the generally accepted standards of care.

Next, the Court turns to Plaintiffs' second argument.  The Plan may not apply a stricter nonquantitative treatment limitation in practice to mental health benefits than it applies to medical/surgical benefits.  29 C.F.R. § 2590.712(c)(4)(i).  The Court must determine whether the Plan applied its criteria more strictly to Lilly's mental health treatment than it applies its criteria to comparable medical/surgical benefits.  Plaintiffs argue the Plan required Plaintiffs to satisfy acute care medical necessity criteria to obtain mental health treatment benefits, but it applied sub-acute criteria in evaluating medical necessity for comparable medical/surgical treatment.  Such a disparity would constitute a violation of the MHPAEA.  *See Theo M. v. Beacon Health Options,* No. 2:19-CV-364-JNP, 2020 WL 5500529, at *5 (D. Utah Sept. 11, 2020) (finding that the plaintiffs sufficiently pleaded a violation of the MHPAEA where they alleged that the defendant required plaintiffs to satisfy acute care medical necessity criteria rather than sub-acute care criteria when defendant offered coverage for sub-acute medical/surgical treatment).

The Plan used CBA's utilization management criteria in denying coverage for Lilly's mental health treatment.  (R. 1188, 2542-43).  When CBA denied the claim due to lack of medical

necessity, it used the utilization management criteria for "Mental Health – Residential Treatment." That criteria requires that "[t]he patient is manifesting acute behavioral health symptoms which represent deterioration from his or her baseline status that could result in harm and cannot be managed outside of a 24-hour structured setting." (R. 2763). In denying coverage for Lilly's treatment, CBA partially based its denial on a lack of acute behavioral symptoms as outlined in the criteria. (R. 1091). It reasoned "[n]o acute problems are noted with the eating disorder (ED). I do not see a weight. The problem list addresses anxiety, depression and the parent child problem but not the ED. No acute problems are apparent that would require residential treatment." *Id*. When MRI denied the claim due to lack of medical necessity—a denial that the Plan adopted as its final decision—it used the utilization management criteria for "Eating Disorder – Residential Treatment." (R. 1050). That criteria requires that "[t]here is a reasonable expectation of reduction in acute behavior(s)/symptom(s) with treatment at this level of care." (R. 2777). It also states: "[t]he patient requires 24-hr supervision as well as monitoring at all meals or restricting/compensatory behavior will occur and/or the patient's clinical status would result in medical complications and/or admission to a higher level of care." *Id.* Applying the criteria to Lilly's treatment, MRI reasoned: "[t]he clinical information submitted did not document body weight, lab, or vital sign abnormalities that required continuous supervision and monitoring, risk of harm to self or others, nor acute unstable mental health symptoms that could not be managed outside of a 24 hour structured setting." (R. 1050).

The dispositive inquiry is whether the Plan uses more liberal criteria when it evaluates medical/surgical benefits. The parties agree that treatment in a Skilled Nursing Facility is the proper medical/surgical comparator for mental health treatment in a Residential Treatment Center. [ECF Nos. 77 p.26, 78 p.26]. As Defendant points out, it uses the BCBS Manual to evaluate

medical necessity for treatment at a Skilled Nursing Facility.  [ECF No. 77 p.28].  Therefore, the

Court will examine the BCBS Manual to determine whether its requirements are more relaxed in

practice than CBA's utilization management criteria for mental health treatment.

The BCBS Manual states that "[a] Skilled Nursing Facility is an institution, which provides

short-term, non-acute, and extended care.  This service could be postoperative or therapeutic for

the acute and/or chronically ill."  (R. 2812) (emphasis added).  The BCBS Manual also requires

that a member must meet one or more of the following admission criteria for the nurse to approve

an initial admission to the skilled nursing facility:

- The member has an illness severe enough to require constant or frequent skilled nursing care on a 24-hour basis that cannot be safely, efficiently, or effectively provided in a home environment or outpatient basis; and/or
- The member is currently receiving inpatient hospital care, inpatient sub acute care, or home skilled nurse visits exceeding 2 or more visits per day; and/or
- The admission to a skilled nursing facility will take the place of an admission to or continued stay at a hospital or sub acute facility; and/or
- There is an expectation of sufficient improvement in the member's condition within a reasonable period of time that would permit the member to be discharged home.

(R. 2814).  While each of these criteria would support admission to a skilled nursing facility, only

the first contemplates the severity of a member's illness or symptoms.  Points two and three

describe the type of care and facility at which a member is receiving treatment.  Point four

contemplates the expectation for improvement of a member's condition.

The Court appreciates the distinction between acute care and acute symptoms.[7]  Both

Residential Treatment Centers and Skilled Nursing Facilities may provide sub-acute **care.**

However, coverage for admission in a Skilled Nursing Facility or Residential Treatment Center

under the Plan depends on the severity of **symptoms** a member exhibits.  *See* (R. 2764, 2777,

---

[7]  *See Lewin-VHI, Inc.*, *Subacute Care: Review of the Literature* (1994), available at https://aspe.hhs.gov/system/files/pdf/138576/scltrves.pdf.

2814).   The criteria the Plan used to deny coverage for Lilly's mental health treatment at a Residential Treatment Center required acute symptoms and behaviors.   The criteria the Plan uses to evaluate treatment at a Skilled Nursing Facility does not use identical language to describe the severity of symptoms required for admission.  *See* (R. 2814).   Therefore, the Court must determine whether the severity of symptoms required by the Plan under its comparable criteria is no less restrictive despite its different wording.

The Court finds that the Plan did not apply its criteria for admission in a Skilled Nursing Facility more restrictively than its criteria for admission in a Residential Treatment Center.   It is not enough for Plaintiffs to show that one criterium describes the severity of symptoms for admission as "acute" while the other does not.   To succeed on their as-applied challenge, Plaintiffs must show that the Plan applies the nonquantitative treatment limitation disparately to mental health benefits and medical/surgical benefits.  *Welp v. Cigna Health & Life Ins. Co.*, No. 17-80237-CIV, 2017 WL 3263138, at *6 (S.D. Fla. July 20, 2017); 29 C.F.R. § 2590.712(c)(4)(ii)(A).   While its criteria are not worded identically, the Plan requires the need for 24-hour care for admission into either a skilled nursing facility or a residential treatment center.  (R. 2763, 2777, 2814).   This is a comparable application.

CBA's utilization management criteria for "Mental Health – Residential Treatment requires that "[t]he patient is manifesting acute behavioral health symptoms which represent deterioration from his or her baseline status that could result in harm and cannot be managed outside of a 24-hour structured setting."  (R. 2763).   The criteria for "Eating Disorder – Residential Treatment" states: "[t]he patient requires 24-hr supervision as well as monitoring at all meals or restricting/compensatory behavior will occur and/or the patient's clinical status would result in medical complications and/or admission to a higher level of care."  (R. 2777).   Similarly, the BCBS

Manual's relevant admission prerequisite[8] states: "[t]he member has an illness severe enough to require constant or frequent skilled nursing care on a 24-hour basis that cannot be safely, efficiently, or effectively provided in a home environment or outpatient basis." (R. 2814). This shows that the substantive threshold for each relevant criterium is the need for 24-hour care, despite the somewhat inconsistent use of the word "acute." This is a comparable application of the admission criteria.

One could imagine a situation where a member exhibits symptoms that require 24-hour care, but the Plan nevertheless deems the symptoms less than acute. A strict application of the criteria would perhaps result in coverage for admission to a Skilled Nursing Facility but not a Residential Treatment Center under these circumstances. Such an application would violate the MHPAEA. However, that is not the case at hand. Both CBA and MRI found that Lilly's symptoms did not require 24-hour care. *See* (R. 1091, 1050). Further, the record is devoid of any example of the Plan applying its criteria in such a way. The reason for this is clear: the Plan considers symptoms that require 24-hour care to be "acute."

This conclusion finds support in the Plan's definitions of each facility. The Plan's definition of Residential Treatment Center contemplates a 24-hour care facility. Under the Plan, a Residential Treatment Center must, among other requirements, (1) maintain full-time facilities for bed care of resident patients, (2) have the services of a psychiatrist or physician extender available at all times, (3) have a physician or registered nurse present onsite at all times (24/7), (4) keep daily medical records for each patient, and (5) primarily provide a continuous structured therapeutic program. (R. 2899, 2981). These requirements show that a Residential Treatment Center under the Plan is a facility for 24-hour care. Similarly, the Plan's limitations on coverage

---

[8] As discussed previously, the BCBS manual provides three other circumstances that would justify admission; but only one contemplates the severity of symptoms a member exhibits.

incurred for admission in a Skilled Nursing Facility show that it is also a facility for 24-hour care. These limitations include: "[t]he Participant must be under the continuous care of a Physician and the attending Physician must certify that the individual requires nursing care 24 hours a day."  (R. 2853, 2935).  Like the admission requirements for treatment in either facility, the definitions of the facilities themselves show that a member must exhibit a need for 24-hour care for admission to be covered.

The Court finds that the Plan did not apply its criteria for admission in a Residential Treatment Center more restrictively than its criteria for admission in a Skilled Nursing Facility.  While its criteria are not worded identically, the Plan requires the need for 24-hour care for admission into either a Skilled Nursing Facility or a Residential Treatment Center.  This application is proper, and it is the application the Plan carried out in this case.  Accordingly, the Court finds that the Plaintiffs' as-applied challenge under the MHPAEA must fail.

## CONCLUSION

For the foregoing reasons, Defendant's motion for judgment, ECF No. 77 is GRANTED. Plaintiff's motion for judgment, ECF No. 78, is DENIED.  This action is dismissed with prejudice.

IT IS SO ORDERED.

/s/Sherri A.  Lydon
Sherri A.  Lydon
United States District Judge

March 17, 2021
Florence, South Carolina